254 So.2d 734 (1971)
JACK COLE  DIXIE HIGHWAY COMPANY
v.
RED BALL MOTOR FREIGHT, INC.
No. 46373.
Supreme Court of Mississippi.
November 8, 1971.
Rehearing Denied December 6, 1971.
*735 Lipscomb, Barksdale, Steen & Caraway, Jimmie B. Reynolds, Jr., Jackson, for appellant.
Butler, Snow, O'Mara, Stevens & Cannada, Roger C. Landrum, Jackson, for appellee.
BRADY, Justice:
This suit was based upon a $100,000 promissory note issued by a company known as the Dixie Highway Express, Inc., payable to English Realty Company, Inc., bearing interest at the rate of 5% per annum with reasonable attorneys' fees for collection, which was assigned to Red Ball Motor Freight, Inc., hereinafter called appellee or Red Ball. While this suit was pending, Dixie Highway Express merged with its parent company, Jack Cole Company under the name of Jack Cole-Dixie Highway Company, hereinafter designated as Cole-Dixie or appellant. From a judgment in the sum of $168,943.34 in the Circuit Court of Hinds County, this appeal is perfected.
The facts in this suit are prolix. However, it is not necessary to go into great detail factually except on those issues which merit our consideration as urged by the appellant, assigned as errors committed in the trial of this case in the circuit court. Those facts are as follows:
The record discloses that on January 24, 1963, O.B. English of Dallas, Texas, entered into a purchase agreement with Jack Cole Company, an Alabama Corporation, providing for the sale by O.B. English to Jack Cole Company of all of the capital stock of Dixie Highway Express, consisting of 500 shares of common and 5,500 shares of preferred stock, for a purchase price of $2,500,000. At the time of the sale, Mr. O.B. English was owner of all of Dixie stock outstanding and he was also a substantial stockholder of appellee, Red Ball. The remaining stock of Red Ball was owned by other members of the English family, including the father, who served as president.
The sale of stock of Dixie Highway Express, Inc. by O.B. English to the Jack Cole Company was a transaction which required and received approval by the Interstate Commerce Commission since both companies were interstate motor carriers and were subject to the provisions of Sections 5 and 214 of the Interstate Commerce Act. The parties to the transaction were represented by several attorneys. A large number of legal documents were executed on January 22, 1965, the date of the sale, in connection with the consummation of the sale. At that time Jack Cole Company was owned entirely by the Cole family and upon acquisition of the stock *736 of Dixie Highway Express, Inc., Mr. Jack Cole and his two sons held a meeting and they were elected the three directors and officers of Dixie Highway Express, Inc. At the same time the sale was consummated, the parties to the transaction executed a settlement agreement which recited the settlement of a lawsuit between the Jack Cole Company and Dixie Highway Express, Inc. and an agreement to reduce the purchase price for the Dixie Highway Express, Inc. stock from $2,500,000 to $2,000,000 and also a mutual release of all claims by all parties involved in the sale, including Mr. O.B. English and Mr. Jack Cole, individually, and the corporations. The agreement specifically acknowledged that "Dixie now owes to English Realty Co., Inc., the principal sum of $100,000, plus interest and that nothing contained in this agreement shall be construed to release or otherwise discharge such indebtedness."
In addition to acknowledging this indebtedness from Dixie Highway Express Company, Inc., hereinafter called Dixie, to the English Realty Company, a renewal or replacement note was executed on that date, January 22, 1965, to evidence the continuation of such indebtedness. The record discloses that the note originally was made in 1964 by Dixie to O.B. English. The original note was a demand note in the sum of $100,000. It was executed on June 30, 1964, by Dixie payable to O.B. English. This $100,000 demand note was endorsed by O.B. English and assigned to English Realty Company in exchange for English Realty Company giving credit to O.B. English's accounts receivable on January 19, 1965. On January 22, 1965, Jack Cole, the President of Dixie, executed a new note in the sum of $100,000, which is the note in question, on behalf of Dixie, payable to the English Realty Company. This note bore a due date of January 22, 1967, which is less than two years and which makes the note a short term note within the scope of 49 U.S.C.A. section 314 (1963). The record also discloses that English Realty Company, the wholly owned subsidiary of Red Ball, assigned the note to Red Ball, its parent company, on March 10, 1968.
Elaborate and appropriate resolutions were adopted by the stockholders for the Jack Cole Company and Dixie in order to confirm full authority in Jack Cole and his sons to execute all documents and to do all things necessary and proper to perfect all essentials of the transaction consummated on January 22, 1965, relating to the sale and agreement. Many of the documents introduced at the trial related to the authority of Mr. Jack Cole who signed these various documents, including the note in question. Although appellant in its briefs does not argue the lack of authority on the part of Mr. Cole to execute the note in question and the agreement and the other documents incident thereto, nevertheless we thought it sufficiently important to be noted among the facts.
Likewise, on January 22, 1965, an amendment to the Articles of Incorporation of Dixie was executed by the newly elected officers and directors, the sole stockholders of Dixie, and by Jack Cole Company. This amendment restated the powers of the corporation and further provided that the corporation should have only common stock in its capital stock in lieu of common and preferred stock as thereinbefore provided. This amendment provided that it would be effective when filed for record, which actually took place the following day, January 23, 1965, and in another county on January 27, 1965. Appellant vigorously contends it is this latter date that is the effective date of cancellation.
Appellant assigns three errors committed in the trial court, the first being that the appellant, defendant below, was not in any manner liable to the appellees for the note in question. This error is based upon the following three propositions: Proposition A is that the promissory note in question is void because the issuance thereof on January 22, 1965, was not approved by the Interstate Commerce Commission; proposition *737 B is that the void note in question was not acquired by the appellee for value and in good faith and without notice; and proposition C is that since the note (which is the evidence of the indebtedness) is void, appellee cannot recover indirectly when it is forbidden to do so directly.
The second error asserted by appellant is that the ruling of the trial court below was in violation of the statutory law of the United States (a federal question being at issue) and was a denial to the appellant of due process of law as guaranteed by the Constitution of the United States of America.
The third error urged by appellant is that the amount of attorneys' fees awarded appellee is exorbitant and unreasonable such as to shock the conscience.
The basic issue presented by appellant's first assignment of error is: Was the appellant liable to the appellee because of the execution of the note in question? Appellant urges, and it is conceded by the appellee, that this question is determined by whether or not the promissory note in question is void because the issuance thereof on January 22, 1965 was not approved by the Interstate Commerce Commission. If the promissory note in question is found to be valid, there remains but one other issue that merits our due consideration, namely, was the amount of attorneys' fees awarded the appellee exorbitant and unreasonable such as to shock the conscience?
Appellant predicates its assertion that the note in question is void because its issuance was not approved by the Interstate Commerce Commission upon what it considers a plain interpretation of 49 U.S.C.A. section 20a(2) and (11) (1951), and 49 U.S.C.A. section 314 (1963).
Section 20a(2) provides as follows:
It shall be unlawful for any carrier to issue any share of capital stock or any bond or other evidence of interest in or indebtedness of the carrier (hereinafter in this section collectively termed "securities") or to assume any obligation or liability as lessor, lessee, guarantor, indorser, surety, or otherwise, in respect of the securities of any other person, natural or artificial, even though permitted by the authority creating the carrier corporation, unless and until, and then only to the extent that, upon application by the carrier, and after investigation by the commission of the purposes and uses of the proposed issue and the proceeds thereof, or of the proposed assumption of obligation or liability in respect of the securities of any other person, natural or artificial, the commission by order authorizes such issue or assumption. The commission shall make such order only if it finds that such issue or assumption: (a) is for some lawful object within its corporate purposes, and compatible with the public interest, which is necessary or appropriate for or consistent with the proper performance by the carrier of service to the public as a common carrier, and which will not impair its ability to perform that service, and (b) is reasonably necessary and appropriate for such purpose.
Section 20a(11) provides as follows:
Any security issued or any obligation or liability assumed by a carrier, for which under the provisions of this section the authorization of the commission is required, shall be void, if issued or assumed without such authorization therefor having first been obtained, or if issued or assumed contrary to any term or condition of such order of authorization as modified by any order supplemental thereto entered prior to such issuance or assumption; but no security issued or obligation or liability assumed in accordance with all the terms and conditions of such an order of authorization therefor as modified by any order supplemental thereto entered prior to such issuance or assumption, shall be rendered void because of failure to comply with any provision of this section relating to procedure and other matters preceding *738 the entry of such order of authorization. If any security so made void or any security in respect to which the assumption of obligation or liability is so made void, is acquired by any person for value and in good faith and without notice that the issue or assumption is void, such person may in a suit or action in any court of competent jurisdiction hold jointly and severally liable for the full amount of the damage sustained by him in respect thereof, the carrier which issued the security so made void, or assumed the obligation or liability so made void, and its directors, officers, attorneys, and other agents, who participated in any way in the authorizing, issuing, hypothecating, or selling of the security so made void or in the authorizing of the assumption of the obligation or liability so made void. In case any security so made void was directly acquired from the carrier issuing it the holder may at his option rescind the transaction and upon the surrender of the security recover the consideration given therefor. Any director, officer, attorney, or agent of the carrier who knowingly assents to or concurs in any issue of securities or assumptions of obligation or liability forbidden by this section, or any sale or other disposition of securities contrary to the provisions of the commission's order or orders in the premises, or any application not authorized by the commission of the funds derived by the carrier through such sale or other disposition of such securities, shall be guilty of a misdemeanor and upon conviction shall be punished by a fine of not less than $1,000 nor more than $10,000, or by imprisonment for not less than one year nor more than three years, or by both such fine and imprisonment, in the discretion of the court.
Section 314 provides as follows:
Common or contract carriers by motor vehicle, corporations organized for the purpose of engaging in transportation as such carriers, and corporations authorized by order of the Commission to acquire control of any such carrier, or of two or more such carriers shall be subject to the provisions of paragraphs (2) to (11), inclusive, of section 20a of this title (including penalties applicable in cases of violations thereof): Provided, however, That said provisions shall not apply to such carriers or corporations where the value of capital stock or principal amount of other securities to be issued, together with the value of capital stock and principal amount of other securities then outstanding, does not exceed $1,000,000, nor to the issuance of notes of a maturity of two years or less and aggregating not more than $200,000, which notes aggregating such amount including all outstanding obligations maturing in two years or less may be issued without reference to the percentage which said amounts bear to the total amount of outstanding securities. In the case of capital stock having no par value, the value thereof for the purpose of this section shall be the fair market value as of the date of its issue; and in the case of capital stock having par value, the value for the purpose of this section shall be the fair market value as of the date of its issue, or the par value, whichever is the greater * * *.
As to proposition 1-A, that the promissory note in question is void for failure to gain the approval of the Interstate Commerce Commission, the appellee asserts the following three defenses:
1. That the total indebtedness was less than $1,000,000, the maximum amount permissible under section 314, due to the cancellation of 5,500 shares of preferred stock in the amount of $550,000.
2. That the total short term indebtedness was less than $200,000, the maximum amount permissible under section 314 due to the $160,000 demand note from Dixie Highway Express, Inc. to Birmingham Trust National Bank, being a long term debt rather than a two year short term debt. The only other short term indebtedness *739 is conceded to be the $100,000 note in question.
3. If the $100,000 note in question did require ICC approval prior to its issuance such approval was impliedly granted and subsequently actually recognized and permitted.
The trial judge found that the evidence amply justified each of these three defenses raised by the appellee, and we cannot say that his findings are manifestly wrong or against the overwhelming weight of the evidence. Although each one of these defenses in itself would be sufficient to validate the $100,000 note, nevertheless, we specifically find and dispose of this case on appellee's first assignment of error by holding that the approval of the Interstate Commerce Commission was not required since the total indebtedness of Dixie Highway Express, Inc. was less than $1,000,000. The outstanding debts of Dixie, at the time the second note was issued, are undisputed except for the preferred stock in the amount of $550,000. If the amount of the preferred stock is included, the total indebtedness would be $1,220,000, rather than $670,000 as urged by the appellee, and $220,000 in excess of the amount authorized by the applicable federal statutes which would require investigation and authorization by the Interstate Commerce Commission.
A close examination of the record reflects that all the transactions, documents, and actions of the parties in consummating the sale of Dixie to Jack Cole Company treated the 5,500 shares of Dixie preferred stock as canceled on January 22, 1965. For instance, all of the capital stock of Dixie which was sold to Jack Cole Company consisted of 500 shares of common stock and 5,500 shares of preferred stock, the intended purchase price thereof being $2,500,000. By agreement, the purchase price was reduced to $2,000,000 as noted above. With all the capital stock of Dixie being assigned to Jack Cole Company, new stock certificates evidencing Jack Cole Company's ownership of 500 shares of common stock of Dixie and 5,500 shares of preferred stock of Dixie, being all of the outstanding stock of the corporation, were issued on January 22, 1965.
Apparently in order not to be bound by the express provisions of section 20a(2) and (11) and section 314, supra, the 5,500 shares of preferred stock of Dixie Highway Express, Inc. now owned by Jack Cole Company were marked "surrendered for cancellation" by Jack Cole, President of the corporation, on January 22, 1965. On the same day, January 22, 1965, Jack Cole, as President of Jack Cole Company and as President of Dixie Highway Express, Inc., executed a pledge agreement in favor of Fruehauf Corporation. This pledge agreement assigned to Fruehauf Corporation all of Jack Cole Company's "right, title and interest in and to the 500 shares of common stock of Dixie Highway Express, Inc., * * * said shares being all of the capital stock of said corporation, 5,500 shares of preferred stock of said corporation having been cancelled and retired."
Also on January 22, 1965, an amendment to the articles of incorporation of Dixie Highway Express, Inc. was executed by the newly elected officers and directors of Dixie and by Jack Cole Company, these officers and directors also being the sole stockholders of both companies. This amendment restated the powers of the corporation and further provided that the corporation should have only common stock in its capital structure, in lieu of common and preferred stock as thereinbefore provided. This amendment provided that it would be effective when filed for record. It was filed for record first on January 23, 1965, and again, in another county, on January 27, 1965. This poses the vital question of whether this preferred stock was effectively canceled on January 22, 1965, as urged by the appellee, or on January 23 and January 27, the dates upon which the amendment was filed by the appellant.
The effective date of the amendment is of no consequence to the disposition *740 of this case since the amendment itself was not required for the cancellation of the corporation's preferred stock. There is a wide distinction between the authorized capital stock of a corporation and its actual capital stock. While an amendment to the articles of incorporation would be required to increase or decrease the amount of the "authorized" capital stock of the company, no amendment was required to reduce the amount of actual stock outstanding, this being a matter solely for agreement between the stockholders and the corporation. Whenever a stockholder surrenders his stock to the corporation, the stock is no longer outstanding, regardless of whether the corporation cancels the stock or simply retains the stock as treasury stock; and further, in either event, such stock no longer constitutes a present liability of the corporation. Borg v. International Silver Co., 11 F.2d 147 (C.C.A.2d 1925); Fletcher Cyclopedia Corporations, Vol. 11, §§ 5082, 5088 (1971).
The intent of Dixie to treat the note in question as valid is especially apparent from Dixie's federal income tax return for the year 1965, which reported the surrender and cancellation of all the preferred stock of the corporation on January 22, 1965, and also claimed the amount of interest accrued on the $100,000 note since 1965 as a business expense. There are many other instances where various reports, financial statements, and applications reflected this same intent.
The trial court held that the aforesaid acts constituted a valid surrender and cancellation of the 5,500 shares of preferred stock on January 22, 1965, and that the preferred stock could no longer be considered as constituting outstanding securities, debts or obligations of Dixie. Upon this cancellation, Dixie had less than the $1,000,000 limit on total notes, obligations, debts and liabilities and therefore approval of the Interstate Commerce Commission of the $100,000 note was not required. The trial court held that the $100,000 note in question was merely a renewal of a former indebtedness which was recognized by all litigants and which, in passing, was before the Interstate Commerce Commission when it ruled upon the legality of the merger. The trial court found it unnecessary to consider the question of whether this was an issue or evidence of indebtedness of a new obligation on the part of Dixie for the reason that the appellant failed to prove that the indebtedness of the appellee was in excess of $1,000,000 and appellant failed to prove that the short term notes of Dixie exceeded $200,000. An objective review of the testimony as well as the controlling authorities convinces us that the circuit court was correct in its holding and for these reasons the contention of the appellant that the note was void for the reason that it was not approved by the Interstate Commerce Commission is without merit.
We can briefly dispose of appellant's proposition 1-B, which is that the $100,000 note was not acquired in good faith for a valid consideration and without notice by noting that the appellant failed to present any defense that would be valid and binding as against English Realty Company, the original holder of the note. Therefore, we hold that there is no merit in appellant's second proposition under its first assignment of error.
Appellant's proposition 1-C, as well as appellant's second assignment of error, can likewise be disposed of here. Proposition 1-C was to the effect that since the $100,000 note was void, appellee cannot recover indirectly when it is forbidden to do so directly. Appellant's second assignment of error pertained to a denial of due process of the law because of an alleged violation of the statutory law of the United States. Since we find that the $100,000 note did not fall within the purview of the Interstate Commerce Act and therefore is not void, these questions become mute.
The last assignment of error which deserves consideration is that the trial court erred in awarding the amount of attorneys' fees which appellant urges is exorbitant *741 and unreasonable and in such an amount as to shock the conscience. Again we feel that the trial court was correct in allowing attorneys' fees which amounted to $42,109.71, which represents one-third of the amount involved plus interest which had accrued. We find in Koehring Company v. Hyde Construction Company, 236 So.2d 377 (Miss. 1970) the question of the reasonableness of attorneys' fees discussed in detail. In that case we held as follows:
At the outset we note that no question is raised as to the allowance of attorneys' fees. The only question is to the amount thereof. In approaching the problem we do so with the conviction that the laborer is worthy of his hire even though he be a lawyer. This does not mean, however, that an award can be made with generosity on the one hand or with penurious disregard to the attorney's labor or the other, but rather that it should be made with due regard to the following pertinent factors: The time, labor and costs involved, the novelty and difficulty of the questions involved, the skill requisite in being able to handle the matter properly, the possible jeopardizing or loss of clients or employment while the firm was engaged in this pursuit, the customary charges for similar services, the amount involved and the benefits resulting to the client, the contingency or uncertainty of compensation, and the nature of the courts before which the case was tried. Miss. State Bar, Fee Computation and Suggested Minimum Schedule, § 1, p. 4 (1967), and Hinds County Bar Ass'n, Suggested Basis of Minimum Fee Computation, § 1, p. 6 (1967). * * * (236 So.2d at 385.)
This is in harmony with our holding in Barber v. Barber, 234 Miss. 89, 105 So.2d 630 (1958). In the case at bar the court did not abuse its discretion as was pointed out in Barber v. Barber, supra, for the reason that the appellee was sorely put to task by the excellent brief of appellant and because of the motions which were made, the affirmative defenses which had to be drafted, the essential preparation for trial and the actual trial of this complex lawsuit.
In perfecting this appeal, appellees filed a motion for allowance of attorneys' fees together with a brief in support thereof occasioned by this appeal. However, since it is admitted that the case was handled strictly on a contingent fee contract basis, the attorneys are entitled to recover only that percentage of the amount recovered as was agreed upon. It would be a mistake, in cases handled upon a contingent fee contract basis, to allow an attorney to recover not only the amount agreed upon with his client under the employment contract but also an additional amount based upon the value of services actually necessary to the recovery.
For the foregoing reasons, the judgment of the trial court for the appellee in the sum of $168,943.34 is affirmed.
Affirmed.
GILLESPIE, C.J., and JONES, INZER and SMITH, JJ., concur.